"UNDER SEAL"

FILED
CHARLOTTE, NC
JUN 22 2017
US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>)<br>GUSTAVO GUZMAN )<br>)<br>)<br>_____ ) | DOCKET NO. 3:17cr186-RJC<br><br>**BILL OF INDICTMENT**<br><br>Violations:<br>15 U.S.C. § 78j(b)<br>17 C.F.R. § 240.10b-5<br>18 U.S.C. § 1343<br>18 U.S.C. § 1957(a) |

**THE GRAND JURY CHARGES:**

At the specified times and at all relevant times:

1. From in or around April 2010 to at least August 2015, the defendant GUSTAVO GUZMAN executed a scheme to defraud investors of at least $2 million by falsely representing that he would use their money for options trading and similar investments. Instead of investing the funds as he represented, GUZMAN stole a substantial portion of the investors' money to fund his personal lifestyle, including through large amounts of credit card payments, cash withdrawals and personal expenditures such as rent, utilities, department stores, and luxury car expenses. GUZMAN also used investor money to make Ponzi payments to previous investors. With the money that he did invest, GUZMAN suffered massive trading losses and then lied to investors about the performance of their investments.

**The Defendant and His Entities**

2. GUZMAN formed and operated G2 (or G Squared) Asset Management, LLC (G2), CAS Creative Options LLC (CAS), and East Egg Private Equity (East Egg). GUZMAN held himself out to be an expert in options trading with decades of experience and a successful track record. GUZMAN also was affiliated with an investor education company (that he did not control) as a seminar instructor until in or about 2013.

3. G2 was formed by GUZMAN in or around November 2009. It purportedly was a private investment fund, managed by GUZMAN, that specialized in the trading of equity options.

4. CAS was incorporated by Guzman in or around June 2011. GUZMAN claimed it was a subsidiary of G2. At times, GUZMAN claimed that CAS provided educational content

1

related to options trading. At other times, GUZMAN claimed CAS was itself an investment opportunity that had been founded in 2001 and incorporated in 2007.

5. East Egg was formed by Guzman in or around 2014. It purportedly was a private investment fund, managed by GUZMAN, specializing in real estate investment and the trading of derivatives.

**The Fraudulent Scheme**

6. Between in or around April 2010 through at least August 2015, Guzman raised more than $2 million from approximately ten investors located in North Carolina and elsewhere. GUZMAN met some of his victims through his role as a seminar instructor.

7. As part of the scheme, GUZMAN induced investments into G2, CAS, and East Egg, and attempted to induce additional investments, by making, and causing others to make, false and fraudulent representations, concealing, and causing others to conceal, material facts, and telling, and causing others to tell, deceptive half-truths.

8. As part of the scheme, GUZMAN made, and caused others to make, misrepresentations about the types of investments GUZMAN would make, the safety of those investments, and the returns those investments would generate. For example:

(a) Prior to R.W. and B.W. making their initial investment via wire transfer on or about April 8, 2010, GUZMAN told them that their investment would be safe, would have the primary goals of preserving their capital and minimizing their losses, and would earn returns of 10% to 12% annually.

(b) Prior to victim P.G. investing, GUZMAN represented that P.G.'s money would be safe and would be invested in real estate.

(c) Prior to victim B.H. investing, GUZMAN represented that half of her investment would earn a "guaranteed" 8% profit for eight years and the other half would be placed in an actively managed account that, although not offering a guaranteed rate of return, had "averaged between 12 – 20% a year."

9. In truth and fact, GUZMAN [*handwritten correction: GUZMAN*] had no basis for making any of the above representations. GUZMAN stole a substantial portion of the investors' money. He did not invest it in real estate, but he did send more than $20,000 to an internet Ponzi scheme. To the extent GUZMAN used the victims' money to invest in options and other securities as he had represented he would, he lost nearly all of it.

10. As part of the scheme, GUZMAN often falsely told victims that he was waiving all or a portion of the management fees and other compensation to which he was purportedly entitled. For example:

2

(a) On or about May 12, 2011, GUZMAN emailed victims R.W. and B.W. and falsely represented to them that, "When reading the statements, please note that the only money G2 receives from the acct is the amount listed under the Asset Mgt. fee. ... WE RECEIVE NO OTHER COMPENSATION OTHER THAN LISTED AS AN ASSET MGT. FEE."

(b) On or about January 6, 2012, GUZMAN emailed victim D.W. and falsely represented that, "I have directed that we waive the asset mgt. fee portion from your account for Q4 2011. ... This is not a service extended to all our clients, but something I feel I want to do for your and your family. I hope this helps, my gift to you."

(c) On or about March 5, 2013, GUZMAN emailed victim D.W. falsely claiming that he did not take any fees or bonuses from D.W.'s account in 2012 and that he only charged D.W. $638 in trading fees and expenses for 2012 in exchange for D.W.'s agreement not to redeem his investment during 2013.

(d) Also, on or about March 5, 2013, GUZMAN emailed victims R.W. and B.W falsely claiming that he only charged them $5,000 as "a flat management fee, not the full 2% we normally would charge ... [and] we have not taken our performance incentive of the profits."

11. All of the above statements were false and misleading because, as part of the scheme, GUZMAN did not limit his compensation from investors in the manner he represented. Instead, GUZMAN stole a substantial portion of the investors' money for his own personal use that exceeded any amounts he was entitled to as legitimate management fees or other compensation. GUZMAN used the money for, among other things, large amounts of credit card payments, cash withdrawals and personal expenditures such as rent, utilities, department stores, and car expenses. For example:

(a) On or about June 2, 2013, victim B.W. provided a $100,000 investment to GUZMAN. GUZMAN stole approximately $35,000 of that money and used it to, among other things, make Ponzi payments to other investors and to make car, rent and credit card payments.

(b) On or about November 27, 2013, victims D.R.T. and D.B.T. invested $100,000 with GUZMAN. GUZMAN did not invest this money as promised; rather, he stole it all for personal and unrelated business expenses, including to make Ponzi payments to other investors and to make car, rent and credit card payments

(c) On or about June 6, 2014, victim P.U. invested $10,000 with GUZMAN. GUZMAN did not invest this money as promised; rather, he stole it all for personal and unrelated business expenses.

(d) On or about February 6, 2015, victim P.G. invested $25,000 with GUZMAN. GUZMAN stole at least $13,000 of that money and used it to, among other

3

things, make a Ponzi Payment to another investor, make a rent payment, and make cash withdrawals.

12. As part of the scheme, GUZMAN made additional false and fraudulent representations, fabricated and falsified documents, concealed material facts, and told deceptive half-truths, about the status of the victims' investments to lull his victims from redeeming their investments and complaining to authorities, to provide excuses for failing to give victims their money back, and to induce additional investments from victims. This included falsified and fraudulent IRS Forms and account statements. For example:

(a) On or about April 11, 2012, GUZMAN emailed a fraudulent IRS 1099-MISC Form to victim D.W. falsely indicating that D.W.'s investment had earned $6,717 in 2011.

(b) On or about April 16, 2012, GUZMAN emailed a fraudulent IRS Form 1099-MISC to victims R.W. and B.W. falsely indicating that their investment had increased in value by $39,657 in 2011. After a telephone conversation, GUZMAN, on or about April 18, 2012, sent victims R.W. and B.W. a fraudulent IRS Schedule K-1 falsely indicating that their investment had increased in value by $39,657 in 2011 and that the value of their investment was $317,442. GUZMAN also falsely claimed, among other things, that R.W. and B.W. were receiving a K-1 rather than a 1099 Form because of G2's "purchase of CAS Creative Options [in] mid 2011 and their client base."

(c) On or about June 22, 2012, GUZMAN emailed victim D.W. a fraudulent IRS Schedule K-1 falsely reflecting a $13,362 investment gain for 2011 and a total account value of $106,717.

(d) On or about March 5, 2013, GUZMAN emailed victim D.W. a fraudulent year-end statement for 2012 falsely reflecting a net investment return of $13,511 and a total account value of $120,228.

(e) On or about March 24, 2013, GUZMAN emailed victims R.W. and B.W. a fraudulent IRS Schedule K-1 falsely indicating that their investment had increased in value by $50,794 in 2012 and that the end-of-year value of their investment was $368,326.

(f) On or about April 12, 2013, GUZMAN emailed victim D.W. a fraudulent IRS Schedule K-1 falsely reflecting a $13,511 investment gain for 2012 and a total account value of $120,228.

(g) GUZMAN also sent victims R.W. and B.W. and victim D.W. fraudulent IRS Schedule K-1's for 2013 and 2014, which falsely reflected inflated investment gains and account balances.

13. All of the above statements were false and misleading because, among other reasons, they inflated the actual returns GUZMAN had earned for the victims and concealed

4

GUZMAN's trading losses and misappropriation; contrary to these misrepresentations, most of the victim's money had been lost through trading or stolen by GUZMAN.

14. GUZMAN's lies, including those described above and others, induced certain of his victims to invest additional money with him. For example:

(a) On or about December 28, 2012, Victim B.W. sent GUZMAN an additional $300,000 via wire transfer as an investment.

(b) On or about June 2, 2013, Victim B.W. sent GUZMAN an additional $100,000 as an investment.

## COUNT ONE
### (Wire Fraud Scheme)

16. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 15 of this Bill of Indictment, and further alleges that:

17. From in or about April 2010 to at least August 2015, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**GUSTAVO GUZMAN**

and others known and unknown to the Grand Jury, aiding and abetting one another, with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate commerce any writing, signal, and sound, to wit, the defendant, sent, and caused others to send, emails and telephone calls to victims and sent, and caused victims to send, wire transfers to and from bank accounts he controlled through interstate commerce.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWO
### (Securities Fraud Scheme)

18. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 15 of this Bill of Indictment, and further alleges that:

19. From in or about April 2010 to at least August 2015, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**GUSTAVO GUZMAN**

and others known and unknown to the Grand Jury, willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: the investments in various common enterprises and trading vehicles offered by GUZMAN and his businesses, as set forth above.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNT THREE
### (Transactional Money Laundering)

20. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 15 of this Bill of Indictment, and further alleges that:

21. On or about January 3, 2013, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### GUSTAVO GUZMAN

did knowingly engage, attempt to engage, and caused others to engage, in the following monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposit, withdrawal, transfer and exchange described below of United States currency, funds, and monetary instruments in the amount specified below, such property having been derived from a specified unlawful activity, to wit, wire fraud and securities fraud as alleged in Counts 1 and 2:

Check #5213, in the amount of $16,241.39, drawn on JPMorgan Chase Bank account XXXXX5769 made payable to CITICARDS.

All in violation of Title 18, United States Code, Section 1957(a) and 2.

7

Case 3:17-cr-00186-RJC-DSC   Document 3   Filed 06/22/17   Page 7 of 8

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

   b. All property involved in such violations or traceable to property involved in such violations; and

   c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

   a. A forfeiture money judgment in the amount of at least $2,038,840.69, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL:

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY